**AFFIRM; Opinion Filed February 11, 2020**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00861-CR

### CHRISTOPHER MICHAEL RUBIO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1633703-W**

## OPINION

Before Justices Bridges, Molberg, and Partida-Kipness
Opinion by Justice Molberg

A jury found Christopher Michael Rubio guilty of capital murder, and the trial court assessed the mandatory punishment of life imprisonment without the possibility of parole. In six issues, Rubio contends: (1) his attorney conceded Rubio's guilt in closing arguments, in violation of the United States and Texas constitutions; (2) and (3) his attorney rendered ineffective assistance of counsel; (4) and (5) the trial court committed reversible error by failing, sua sponte, to include in the jury charge an instruction on the lesser-included offenses of murder and manslaughter; and (6) the mandatory statutory sentence of life imprisonment without the possibility of parole violates the prohibition of cruel and unusual punishment under the United States and Texas constitutions.

In a single cross-issue, the State contends this Court may not consider as a part of the appellate record the arguments in, or any evidence presented in support of, Rubio's amended motion for new trial. We affirm the trial court's judgment.

## BACKGROUND

### *Factual Background*

Rubio and Elizabeth Adams dated and they had two children together. They resided in Rubio's apartment, which was located in the same apartment complex where Elizabeth's mother, Connie Adams, lived. Rubio and Elizabeth broke up but they continued to live together. Rubio began dating Dana Grove, who moved into the apartment with Rubio and Elizabeth. Elizabeth began dating James Tewes a few weeks before Rubio killed them both.

At approximately noon on the day of the murders, Rubio and Dana were asleep in his apartment when Connie, John Adams (Elizabeth's brother), and Janice Rist (a family friend), helped move Elizabeth's belongings out of Rubio's apartment and into Connie's apartment. After the move was complete, Connie left to get food, leaving Elizabeth, Janice, John, Timothy and Jennifer (Elizabeth's other siblings), and James, who had come to visit Elizabeth, in the apartment.

At trial, Dana testified that when Rubio woke up and realized Elizabeth's belongings were gone, he became upset and left the apartment to look for the children. Rubio shortly returned to the apartment, took his shotgun out of the closet and loaded it. Dana testified Rubio was angry, and he was yelling "something about [Elizabeth] threatening to take the kids[.]" According to Dana, Rubio knew the children were with Elizabeth's grandparents and Elizabeth was at Connie's apartment. As Rubio loaded his shotgun, Dana tried to calm him, but "[he was] not listening. He's going, [']I'm tired, I can't do it anymore[']." Rubio left the apartment with his shotgun. When he returned approximately twenty minutes later, Rubio told Dana, "I killed them. I did it. I killed them. They're dead."

Elizabeth's brother John testified he was at Connie's apartment when Rubio knocked on the door and demanded to know where Elizabeth and the children were. Rubio left when John said he did not know. Shortly thereafter, Rubio returned to Connie's apartment with a shotgun. When John answered the door, Rubio threatened to kill him and then forcibly entered Connie's apartment and went upstairs. A few moments later, gunshots were fired. Rubio fled Connie's apartment and ran into his apartment. When John discovered James dead in the bathroom, he ran out of Connie's apartment.

Timothy Adams, Elizabeth's brother, lived with Connie. Prior to Rubio's arrival at Connie's apartment on the day of the murders, Timothy, Elizabeth, and James were in Timothy's bedroom watching a movie for a while before Elizabeth and James went to Connie's bedroom. Timothy testified he was sitting on his bed when Rubio entered his bedroom with a shotgun and demanded to know Elizabeth's whereabouts. When Timothy said he did not know, Rubio went to Connie's bedroom, where Janice was hiding, and he kicked open the locked bedroom door.[1] According to Janice, Elizabeth and James were hiding in the upstairs bathroom. Rubio pointed the shotgun at Janice and said, "Where's the fucking bitch." When Janice replied she did not know, Rubio returned to Timothy's bedroom.

Rubio then went to the upstairs bathroom and said, "James, open up the door—open the door." Rubio attempted to kick open the door, but James was pushing the door from inside the bathroom to prevent Rubio from entering and "there [was] too much force on the other side for anything to happen." Rubio "tells James that he has one more chance to open the bathroom door . . . he counts to three and he shoots through [the door]." Rubio entered the bathroom and fired more shots. The police discovered James' body on the bathroom floor and Elizabeth's body in the

---

[1] When Janice heard Rubio at the front door of Connie's apartment, she ran to Connie's bedroom and locked the door.

bathtub. Both James and Elizabeth had been shot. At the time of their deaths, Elizabeth was nineteen years old and James was twenty.

### *Procedural History*

A jury found Rubio guilty of capital murder. On July 11, 2018, the trial court sentenced Rubio to life imprisonment without the possibility of parole, as required by section 12.31 of the Texas Penal Code, since the State was not seeking the death penalty. TEX. PENAL CODE ANN. § 12.31. On the same day, Rubio timely filed a general form motion for new trial challenging the verdict as contrary to the law and the evidence, which the trial court promptly overruled. On August 10, 2018—thirty days after sentence was pronounced in open court—Rubio, represented by new counsel, filed a motion for leave to file amended motion for new trial and an amended motion for new trial, alleging new grounds upon which he sought a new trial. In its response, filed on September 14, 2018, the State objected to Rubio's amended motion for new trial as untimely and asked the trial court to take no action on the amended motion. On September 18 and September 20, 2018, Rubio filed eleven additional exhibits to his amended motion for new trial. The trial court conducted a hearing on September 21, 2018, seventy-two days after sentence was pronounced. At the hearing, the State again objected to Rubio's amended motion as untimely and objected to the hearing. The State also objected to the exhibits Rubio filed on September 18 and September 20 in support of his amended motion. Addressing Rubio's new counsel, and without rescinding or vacating its previous denial of Rubio's timely motion for new trial, the trial court stated, "Well, I'm going to let you present your motion because you have done all this work." At the end of the hearing, the trial court denied Rubio's amended motion. This appeal followed.

# ANALYSIS

## *State's Cross-Issue:  Rubio's Amended Motion for New Trial Was Untimely*

We begin our analysis by addressing the State's cross-issue, which will determine the arguments and evidence we may consider as part of the record on appeal to resolve Rubio's issues. The State argues the permissible time for Rubio to file an amended motion for new trial terminated when the trial court overruled his timely motion for new trial.  Therefore, says the State, this Court may not consider the arguments in Rubio's amended motion, the exhibits filed in support thereof, or any evidence presented in the trial court at the September 21, 2018 hearing.  In response, Rubio contends the trial court had plenary jurisdiction, for seventy-five days from the date sentence was pronounced in open court, to rescind its order denying Rubio's timely motion for new trial.  Rubio argues this Court may consider the amended motion, related exhibits, and evidence presented in the trial court during the hearing because "the trial court impliedly rescinded her original ruling when she denied the State's objections to the timeliness of [Rubio's] amended motion for new trial and exhibits and conducted a hearing on Appellant's new claims."

Texas Rule of Appellate Procedure 21.4(b) dictates the permissible time for amending a motion for new trial:

> (b) *To Amend*.  Within 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial.

TEX. R. APP. P. 21.4(b).  Texas Rule of Appellate Procedure 21.8(a) grants a trial court limited post-judgment jurisdiction to exercise plenary power to rule on a timely filed motion for new trial:

> (a) *Time to Rule*.  The court must rule on a motion for new trial within 75 days after imposing or suspending sentence in open court.
>
> (b) *Ruling*.  In ruling on a motion for new trial, the court may make oral or written findings of fact.  The granting of a motion for new trial must be accomplished by written order.  A docket entry does not constitute a written order.

–5–

(c) *Failure to Rule.* A motion not timely ruled on by written order will be deemed denied when the period prescribed in (a) expires.

TEX. R. APP. P. 21.8.

While a trial court may rescind an order granting or denying a motion for new trial after the thirty-day deadline imposed by rule of appellate procedure 21.4(b), *Kirk v. State*, 454 S.W.3d 511, 515 (Tex. Crim. App. 2015), the trial court may not allow a motion for new trial to be amended after overruling a preceding motion. TEX. R. APP. P. 21.4(b); *Starks v. State*, 995 S.W.2d 844, 846 (Tex. App.—Amarillo 1999, no pet.) ("The overruling of a preceding motion [for new trial] terminates the time during which amendments are allowed."); *see also Castillo-Diaz v. State*, No. 05-17-00644-CR, 2018 WL 5291979, at *3 (Tex. App.—Dallas Oct. 25, 2018, no pet.) (mem. op., not designated for publication) ("[O]nce the trial court denied [appellant's] timely-filed motion, he could no longer file an amended motion for new trial."); *Earl v. State*, No. 05-99-00237-CR, 2000 WL 566961, at *7 (Tex. App.—Dallas Apr. 28, 2000, pet. ref'd) (not designated for publication) ("Because appellant's original motion for new trial had been overruled by the time appellant sought leave to file an amended motion, the time for amending the motion had expired and the trial court had no discretion to grant appellant leave to file an amended motion."); *Else v. State*, No. 05-99-00238-CV, 2000 WL 566962, at *7 (Tex. App.—Dallas Apr. 28, 2000, pet. ref'd) (not designated for publication) (same). Our sister courts of appeals have agreed that a defendant may not file an amended motion for new trial after the trial court denies a preceding motion for new trial. *See State v. Barron*, No. 08-12-00245-CR, 2014 WL 505497, at *2 (Tex. App.—El Paso Feb. 7, 2014, pet. ref'd) (not designated for publication); *Silguero v. State*, No. 13-01-860-CR, 2005 WL 3214849, at *3 (Tex. App.—Corpus Christi-Edinburg Nov. 30, 2005, pet. ref'd) (mem. op., not designated for publication); *Springstun v. State*, No. 14-98-01455-CR, 2001 WL 491204, at *1 (Tex. App.—Houston [14th Dist.] May 10, 2001, no pet.) (not designated for publication)

("trial court has no discretion to grant leave to amend an overruled motion for new trial"); *Starks*, 995 S.W.2d at 846.

Rubio's reliance on *Porter v. State*[2] and *Awadelkariem v. State*[3] to argue this Court should consider the arguments in his amended motion for new trial and related evidence is unavailing. The procedural facts and relevant issue in *Porter* were so different from those in the case at hand as to be inapposite. In *Porter*, Derek Dale Porter was convicted of felony assault. Porter filed a timely motion for new trial, which the trial court denied. Porter did not file an amended motion for new trial, as Rubio did here. Instead, Porter filed a notice of appeal. Porter then filed a motion to abate the appeal and asked the appellate court to remand the case to the trial court to allow him an opportunity to file an out-of-time amended motion for new trial based on his argument that he received ineffective assistance of counsel. In its opinion on rehearing, the First District Court of Appeals denied Porter's motion, stating, "the issues he seeks to develop can be properly raised in a post-conviction writ of habeas corpus." No. 01-17-00534-CR, 2018 WL 4169482, at *9 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op. on reh'g, not designated for publication).

The facts and issues in the case before us also are critically distinct from those in *Awaldelkariem v. State*, 974 S.W.2d 721 (Tex. Crim. App. 1998). In *Awadelkariem*, the trial court rescinded—*in writing*—its order *granting* the defendant's original motion for new trial. Whereas, in this case (1) the trial court did not rescind or revoke its original order in writing, and (2) the trial court's order *denied* Rubio's timely motion for new trial, which instance is expressly contemplated

---

[2] No. 01-17-00534-CR, 2018 WL 3581082 (Tex. App.—Houston [1st Dist.] July 26, 2018, pet. ref'd) (mem. op., not designated for publication), *opinion withdrawn and superseded on denial of reh'g*, No. 01-17-00534-CR, 2018 WL 4169482 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op. on reh'g, not designated for publication).

[3] 974 S.W.2d 721 (Tex. Crim. App. 1998), *overruled in part by Kirk v. State*, 454 S.W.3d 511, 515 (Tex. Crim. App. 2015).

and addressed by rule of appellate procedure 21.4(b).  In *Awadelkariem*, the trial court initially granted the defendant's motion for new trial.  Later, the trial court *crossed out its signature on the order* granting the motion and added the notation, "No action taken on this order."  At a hearing on the defendant's motion for new trial, the trial court explained that it crossed out the signature on its previous order because the defendant had reneged on a post-sentencing plea agreement:

> I sentenced you to eight years regular probation.  Thereafter, you and your attorney came before me the same day and asking [sic] me, if you changed your plea, whether or not I would consider giving you deferred.  After some discussion, you presented me the motion for new trial and I did sign that on the condition that y'all were going to go before the magistrate's court and enter a plea of guilty, at which time I had gone ahead and okayed the fact that you would, I had authorized the magistrate to enter a plea of eight years deferred....  Thereafter, I understand y'all did not go before the magistrate.  At that point I rescinded my order granting the motion for new trial.  And that was the reason I rescinded.  The only reason I granted or signed the motion that day was to facilitate you changing your plea and going to the magistrate and entering a plea of guilty, which you did not do.  Therefore, I rescinded the order on the motion for new trial and let it stand in the same place as of the time I sentenced you to eight years probation.

*Id.* at 723.[4]

*Awadelkariem*'s progeny, *Kirk v. State*, 454 S.W.3d 511 (Tex. Crim. App. 2015), is distinguishable from this case for the same reasons.  Here, (1) the trial court's original order did not grant, but rather, denied Rubio's timely motion for new trial, and (2) the trial court did not rescind, revoke, or vacate its original order in writing.  In *Kirk*, the State filed a motion to rescind the trial court's order granting the defendant a new trial on punishment.  Seventy-six days after the imposition of sentence, the trial court *signed an order* rescinding its original order.  The court of

---

[4] Noting that Texas Rule of Appellate Procedure 21.8 grants the trial court seventy-five days to rule on a motion for new trial, the court of criminal appeals in *Awadelkariem* held that a trial court may rescind "an order granting or denying a motion for new trial . . . so long as such action occurs within the 75 days provided by the rules (i.e., current Rule 21.8(a) & (c))."  974 S.W.2d at 728.  In *Kirk*, the court of criminal appeals abandoned the seventy-five day limit imposed by *Awadelkariem*, and held that a trial court has the power to rescind an order granting a new trial at any time: "In [*Awadelkariem*], we suggested that there was a time limit on the trial court's power to rescind the granting of a new trial.  We now conclude that there is no specific time limit on the trial court's power to do so."  454 S.W.3d at 511.

criminal appeals clarified its decision in *Awadelkariem* and held "there is no specific time limit on the trial court's power" to rescind an order granting a new trial. *Id.* Continuing to "adhere to the holding in *Awadelkariem* that a trial court has the power to rescind an order granting a new trial," the *Kirk* court "overrule[d] *Awadelkariem* to the extent it held that this power was subject to a seventy-five-day time limit." *Id.* at 515.

In the case at hand, sentence was imposed in open court on July 11, 2018, and Rubio filed a motion for new trial on the same day. At that point, Rubio faced two possible deadlines to amend his motion for new trial to correct any deficiencies—until August 10, 2018, the statutory thirty-day deadline to amend, or until the trial court denied Rubio's timely motion for new trial, whichever came first. *See* TEX. R. APP. P. 21.4(b) (defendant may file one or more amended motions for new trial "[w]ithin 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial"). Once the trial court signed the order denying Rubio's timely filed motion, he could no longer file an amended motion for new trial. Rubio did not file a motion to rescind the trial court's order denying his timely motion for new trial. *See Castillo-Diaz,* 2018 WL 5291979, at *3 ("Because the trial court never granted the motions to rescind its previous order denying appellant's motions for new trial, the trial court had no reason to consider the amended motions for new trial."). Nor did the trial court rescind its original order in writing of its own accord.[5] Rubio cites no authority supporting his claim that under these circumstances, the trial court "impliedly" rescinded its order denying his timely motion for new trial.

Because Rubio's amended motion for new trial was filed after the trial court denied his timely motion for new trial and the State properly objected to the amendment and related exhibits,

---

[5] While we do not address whether a trial court can rescind an order denying a new trial by explicit verbal statement on the record, we note that in this case, the trial court did not do so.

the amended motion was untimely. As such, the trial court should not have allowed Rubio to present evidence on his new claims, and it did so in error. TEX. R. APP. P. 21.4(b); *see also State v. Moore*, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007). Nevertheless, it is well-settled that an ineffective assistance of counsel claim may be raised without the necessity of a motion for new trial. *Robinson v. State*, 16 S.W.3d 808, 809–13 (Tex. Crim. App. 2000). Therefore, we will consider Rubio's ineffective assistance of counsel claim based only on the trial record, without giving consideration to the arguments in, and documents filed in support of, his amended motion for new trial or the evidence presented at the September 21, 2018 hearing. We resolve the State's cross-issue in its favor.

### Issue 1:  Defense Counsel Did Not Concede Rubio's Guilt

In his first issue, Rubio contends defense counsel violated *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), by conceding Rubio's guilt in closing argument and by "failing to meaningfully test the State's case." The State responds that defense counsel did not concede Rubio's guilt to the jury; and even if he had, Rubio failed to preserve this issue for appellate review by failing to "timely object or to make an express statement of his will to maintain his innocence during trial."

Rubio's assertion that his attorney failed to meaningfully test the State's case is an ineffective assistance of counsel claim to which *McCoy* does not apply. *Id.* at 1510–11 ("Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence . . . to McCoy's claim."). Thus, our review of Rubio's first issue on appeal is limited to the question of whether defense counsel conceded Rubio's guilt in closing argument, in violation of *McCoy*. Because we conclude Rubio's counsel did not concede guilt in closing argument, we need not address the question of whether Rubio failed to preserve the issue for appeal.

## *McCoy v. Louisiana*

In May 2018, the United States Supreme Court decided *McCoy v. Louisiana*. *Id.* at 1503–07. In *McCoy*, Robert McCoy was charged with first-degree murder for killing the mother, stepfather, and son of his estranged wife. McCoy pleaded not guilty to the charges. The State gave notice of intent to seek the death penalty. Before trial, McCoy's attorney concluded the evidence against his client was overwhelming and that, absent a concession at the guilt stage that he was the killer, a death sentence was inevitable. When told that his attorney planned to concede his commission of the murders at trial, McCoy was "furious," and he instructed his attorney "not to make that concession" and to pursue acquittal. Nevertheless, in his opening statement at trial, McCoy's attorney told the jury there was "no way reasonably possible" that they could hear the prosecution's evidence and reach "any other conclusion than Robert McCoy was the cause of [the victims'] deaths." McCoy protested, and out of the jury's earshot, he told the trial court that defense counsel was "selling [him] out" by maintaining that McCoy "murdered" his family. When allowed to proceed with his opening statement, defense counsel told the jury the evidence was "unambiguous" and that McCoy "committed three murders." He argued, however, that McCoy did not have the requisite mental state to warrant a first-degree murder conviction and was guilty, instead, of the lesser-included offense of second-degree murder.

Testifying at trial, McCoy maintained his innocence and presented an improbable alibi. He claimed the victims were killed by the local police, and he had been framed by a conspiracy of state and federal officials, his attorney, and the trial judge. In his closing argument, defense counsel reiterated that McCoy was the killer, and he told the jury he "took [the] burden off of [the prosecutor]" on that issue. The jury convicted McCoy of first-degree murder on all three counts. At the penalty phase, McCoy's attorney again told the jury, "Robert McCoy committed these

–11–

crimes," but he asked for leniency due to McCoy's serious mental and emotional issues. The jury sentenced McCoy to death.

The Supreme Court reversed McCoy's conviction and remanded the case for a new trial. The Court held that the Sixth Amendment to the United States Constitution demands that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* at 1505. The Supreme Court explained that maintaining one's innocence is not merely an issue of trial tactics, i.e., the attorney's strategic choices about how best to achieve a client's objectives. *See id.* at 1508. Rather, the decision to assert innocence is an objective of representation. *Id.* at 1505, 1508. As such, it is a decision reserved for the client, and his attorney may not override that objective by conceding guilt:

> With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

*Id.* at 1505; *see also id.* at 1509 ("When a client expressly asserts that the objective of 'his defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by the objective and may not override it by conceding guilt.").

<u>Defense Counsel's Closing Argument Did Not Concede Rubio's Guilt</u>

On appeal, Rubio contends his attorney's closing argument conceded that Rubio killed Elizabeth and James, in violation of *McCoy*. In his closing statement, defense counsel stated:

> Ladies and gentlemen, you've been here for the last few days and seen a trial unlike any trial that you will probably ever see if you were called down here for the rest of your lives to be on jury duty. We talked to you in the voir dire process about the fact that the defendant was charged with a crime; that if you, in fact, committed the offense, there is no other issues [sic] involved.
>
> As I stood in the voir dire process and talked to you and explained to you the way a trial works, you did not have the knowledge at that point in time, and

certainly we couldn't stand before you and I couldn't stand before you and tell you about how bad the facts of the case were going to be that you were going to hear. But we talked to you about the fact that when you listen to the evidence, the State has to be held to meet their burden of proof, and that same thing applies whether they have a good case or a bad case.

So as we sat here this week, I didn't insult your intelligence by questions in regards to things that weren't going to be important. There's things that's required by the law. The defendant was entitled to hold the State to their burden of proof, and we've done that. You will go back there and you'll ask yourself the question that I spoke to you about in voir dire as to whether or not the State has proven this case to you.

Certainly, as I stand here before you, you've seen the evidence. I'm not going to stand here and make a mockery of common sense and reason as I talk to you now. It's a shame that in a situation like this, you only get to hear part of the case regarding the thing that Christopher Rubio is accused of doing. And with all of his loved ones and folks who can speak and talk about who was the person that may have done these things, you don't get to hear that because there is no punishment phase in this type of a trial.

So as I stand before you, I will charge you to do just exactly what we spoke about in the voir dire process, is you go back there, use your reason and your common sense, and you ask yourself the questions that we spoke about in voir dire, and you arrive at a verdict that you think is appropriate in this case. Thank you.

In voir dire, defense counsel apprised the venire members:

The main thing to do and the main starting block for a criminal trial is that everybody must give the defendant in a case the presumption of innocence. The State's talked to y'all about that, and a couple of you said that you have a problem with the presumption of innocence. And the main thing about that is a lot of people will sometimes say, well—you have heard of the old expression "where there is smoke, there is fire." And a lot of people think that just because someone's down here and they have been charged and indicted by a grand jury that they're automatic and probably guilty.

So it's important, as you come into the courtroom, everybody steps back and recognizes the fact that all we have right now is an allegation and an accusation that the defendant has committed a criminal act. So it's very important to be able to sit there and set aside any preconceived ideas you might have and say that I will sit here and give the defendant the benefit of the doubt, and I will understand that in order for him to be found guilty, it is not required that he prove himself to be innocent but it is required that the State of Texas prove, if they can, that he is guilty. Okay? So that's the very first thing, and the prosecution talked to you about that.

> The second part that you have to understand is that the State of Texas always has the burden of proof. That means it's required that the jurors always look to this table to see whether or not the State has brought to you the kind of evidence that will convince you of a person's guilt. I'll be the first one to tell you, and they'll probably agree, jurors in this building hear cases all the time where the jurors come back and say Mr. Prosecutor, Madam Prosecutor, you didn't convince us. You did not convince us beyond all reasonable doubt, and we find the defendant not guilty.

Defense counsel's voir dire remarks repeatedly cautioned the venire members that the law does not require Rubio to prove his innocence: "[W]hen someone's accused of a crime, they don't have the burden to do anything. They don't have to come [to court] and try to prove their innocence." Accordingly, defense counsel clarified that the jury's obligation was not to determine whether Rubio was innocent, but rather, whether he was guilty or not guilty. Counsel's remarks emphasized that the burden to prove Rubio's guilt is "always upon the State. It's beyond all reasonable doubt. If you're not convinced, the law says that you find that person to be not guilty."

In contrast with defense counsel's statements to the jury in *McCoy*, here, defense counsel's closing argument, considered in context with his voir dire remarks, plainly did not concede his client's guilt. At no time did defense counsel state that Rubio committed murder. Nor did he concede facts that showed Rubio was guilty of an element of the offense of murder. To the contrary, counsel's closing argument held the State to its burden of proof, stating, "the State has to be held to meet their burden of proof, and that same thing applies whether they have a good case or a bad case." *Compare Turner v. State*, 570 S.W.3d 250, 271–77 (Tex. Crim. App. 2018) (defense counsel conceded guilt in violation of *McCoy* by stating defendant killed his wife in a "jealous rage," he was guilty of "two terrible horrible crimes," "he can't admit what he did, to himself or anybody else," he "snapped," "he literally cannot accept what happened"), *with United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995) (defense counsel did not concede guilt in closing argument by stating he was not going to dispute testimony from three police officers

–14–

that they both purchased drugs from his client, even though defendant had testified they were lying).

We conclude defense counsel did not concede Rubio's guilt to the jury in violation of *McCoy*. We resolve Rubio's first issue against him.

### Issues 2 and 3:  Rubio Failed To Establish He Had Ineffective Assistance of Counsel

In his second and third issues on appeal, Rubio claims he received ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), and *Strickland v. Washington*, 466 U.S. 668 (1984), in violation of the "Fifth, Sixth, Eighth, and Fourteenth Amendments [to the United States Constitution] and corresponding Texas constitutional provisions, including Article I, sections 10 and 19."[6]  We use the same legal analysis to review an ineffective assistance of counsel claim under the United States and Texas constitutions. *Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992).

#### Standard of Review

Generally, alleged error must be brought to the attention of the trial court before a complaint can be heard on appeal. Tex. R. App. P. 33.1.  However, a claim for ineffective assistance of counsel may be raised on appeal without the necessity of a motion for new trial and generally will not be foreclosed because of an appellant's inaction at trial. *Robinson*, 16 S.W.3d at 809.

We review a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial court's decision was clearly erroneous and arbitrary. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013).  A trial court abuses its discretion if, viewing the evidence in the light most favorable to the trial court's decision, no reasonable view of the record

---

[6] Although Rubio alleges violations of the "Fifth, Sixth, Eighth, and Fourteenth Amendments and corresponding Texas constitutional provisions, including Article I, sections 10 and 19" in the final sentence of the section in his brief addressing his second and third issues on appeal, the body of his brief only addresses the Sixth Amendment to the United States Constitution.  Regardless, our resolution of Rubio's second and third issues is the same.

–15–

could support its ruling. *Id.* In the absence of express findings, as here, we presume the trial court made all findings, express and implied, in favor of the prevailing party. *Id.*

<u>The *Cronic* and *Strickland* Standards for Ineffective Assistance of Counsel Claims</u>

A defendant is entitled to reasonably effective assistance of counsel under the Sixth Amendment to the United States Constitution and under section 10 of article I of the Texas Constitution. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The right to counsel, however, does not mean the right to errorless counsel. *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013).

In most cases, we review an ineffective assistance of counsel claim under the *Strickland v. Washington* standard, which includes a performance prong and a prejudice prong. 466 U.S. at 687. To obtain a reversal of a conviction due to ineffective assistance of counsel under *Strickland*, an appellant must demonstrate by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*; *see also Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

Our review of counsel's representation under the first prong of *Strickland* is highly deferential. We indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance, including the possibility that counsel's actions were strategic. *Strickland*, 466 U.S. at 689; *see also Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). We focus on the totality of the representation afforded and not on individual alleged errors. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). We consider the adequacy of assistance as viewed at the time of trial, not in hindsight. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). We may not second-guess counsel's strategic decisions, *Frangias*, 450 S.W.3d at 136, and defense counsel's

–16–

trial strategy cannot be considered ineffective assistance of counsel simply because another attorney would have used a different strategy, *Ex Parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

To defeat the presumption of reasonable representation, an allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). We will not speculate to find defense counsel ineffective. *Wilson v. State*, No. 05-17-01003-CR, 2018 WL 6333245, at *3 (Tex. App.—Dallas Nov. 29, 2018, no pet.) (mem. op., not designated for publication); *see also Wood v. State*, 260 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2008, no pet.). A silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *Thompson*, 9 S.W.3d at 814. Thus, if the record does not contain affirmative evidence of trial counsel's reasoning or strategy, we normally presume counsel's performance was not deficient. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Moreover, "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander*, 101 S.W.3d at 111.

For these reasons, the record on direct appeal frequently is insufficiently developed to support a claim of ineffective assistance of counsel. *Robinson*, 16 S.W.3d at 813 n.7. The best way to make a sufficient record to support such a claim is by a hearing on an application for writ of habeas corpus or, alternatively, a hearing on a motion for new trial. *See Thompson*, 9 S.W.3d at 814–15; *Jackson*, 877 S.W.2d at 772–73 (Baird, J., concurring). Only when "counsel's ineffectiveness is so apparent from the record" will an appellant asserting an ineffective assistance of counsel claim prevail on direct appeal. *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003).

To show prejudice under the second prong of *Strickland*, an appellant must demonstrate a reasonable probability that the outcome would have differed but for trial counsel's errors. *Strickland*, 466 U.S. at 694; *see also Jackson*, 877 S.W.2d at 771. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Jackson*, 877 S.W.2d at 771 (quoting *Strickland*, 466 U.S. at 694). It is not sufficient to show defense counsel's errors "had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Rather, to establish prejudice, an appellant must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Id.* at 687. Failure to satisfy either prong of the *Strickland* standard is fatal. *Perez*, 310 S.W.3d at 893; *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006); *Rylander*, 101 S.W.3d at 110. Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

In rare cases, an appellant claiming ineffective assistance of counsel is not required to show prejudice; rather, prejudice is presumed and the appellant only is required to show deficient performance. *Cronic*, 466 U.S. at 658–60; *see also Florida v. Nixon*, 543 U.S. 175, 190 (2004). In *Cronic*, the Supreme Court identified three situations implicating the right to counsel so likely to prejudice the accused that prejudice is presumed: (1) the accused was denied the presence of counsel at a critical stage of trial, (2) counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or (3) circumstances at trial were such that, although counsel was available to assist the defendant during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. 466 U.S. at 659–60. Here, Rubio contends prejudice is presumed due the second circumstance—counsel entirely failed to subject the State's case to meaningful adversarial testing.

We may presume prejudice under *Cronic* with respect to Rubio's ineffective assistance claim only if his attorney's failure to subject the State's case to meaningful testing was complete. *Id.* at 659 (prejudice is presumed if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"); *see also Giles v. State*, No. 05-18-00865-CR, 2019 WL 6486257, at *4 (Tex. App.—Dallas Dec. 3, 2019, no pet.) (mem. op., not designated for publication). "[B]ad lawyering, regardless of *how* bad, does not support the presumption of prejudice under *Cronic*." *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997). Rather, there must be "a constructive denial of the assistance of counsel altogether." *Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008) (citing *Cronic*, 466 U.S. at 658–59). The Texas Court of Criminal Appeals has explained:

> [A] defendant is denied counsel not only when his attorney is physically absent from the proceeding, but when he is mentally absent as well, i.e., counsel is asleep, unconscious, or otherwise actually *non compos mentis*. This prong of *Cronic* is epitomized by the "inert" or "potted plant" lawyer who, although physically and mentally present in the courtroom, fails to provide (or is prevented from providing) *any* meaningful assistance. In this situation, courts presume prejudice based upon the actual or constructive denial of counsel "when such absence threatens the overall fairness of a trial."

*Ex parte McFarland*, 163 S.W.3d 743, 752–53 (Tex. Crim. App. 2005).

In *Cannon*, the court of criminal appeals applied the *Cronic* presumption of prejudice where defense counsel "effectively boycotted the trial proceedings" and "abandoned his role as advocate for the defense." 252 S.W.3d at 350 (noting that counsel, in part, declined to participate in jury selection, declined to make objections, declined to cross-examine State witnesses, declined to make an opening or closing argument, and declined to offer any defense because he was "unprepared to go forward"). Moreover, *Cronic* recognized, "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interest of his client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand

–19–

trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt." 466 U.S. at 656 n.19 (internal citation omitted).

The difference between the *Cronic* and *Strickland* standards is not of degree, but of kind. *Bell v. Cone*, 535 U.S. 685, 697 (2002). In other words, the standards distinguish between shoddy representation and no defense at all. *Childress*, 103 F.3d at 1229. If Rubio received "some meaningful assistance," there was no constructive denial of counsel and *Cronic* does not apply. *Id.* Accordingly, prejudice only may be presumed if Rubio establishes his attorney was not merely incompetent but inert. *Id.* at 1228.

Rubio Is Not Entitled To Relief Under <em>Cronic</em>

In his second issue, Rubio claims he received ineffective assistance of counsel under the *Cronic* standard because his trial attorney "wholly failed to subject Mr. Rubio's case to meaningful adversarial testing." The State responds that Rubio's counsel did not entirely fail to subject the State's case to meaningful testing and, therefore, prejudice may not be presumed under *Cronic*. According to the State, "from jury selection through closing argument, trial counsel was clearly employing a strategy of holding the State to its burden of proof." The State points to several instances in the trial record to illustrate that *Cronic* does not apply, including that defense counsel filed an omnibus pre-trial motion on which he obtained appropriate rulings and agreements; conducted voir dire in which he emphasized Rubio's presumption of innocence, the State's burden of proof, and the jury's duty to hold the State to its burden of proof; secured agreed challenges for cause as to jurors that would not have been favorable to the defense; objected to questions regarding hearsay and relevance; argued in his closing statement that the jury must hold the State to its burden of proof; and did not at any point concede Rubio's guilt.

Here, Rubio does not complain he was denied counsel at a critical stage of trial or that defense counsel was inert. Rather, Rubio complains of his attorney's alleged errors, omissions,

and strategic decisions, all of which go to incompetence. The record does not support a finding that Rubio had no meaningful assistance of counsel, that defense counsel was inert, or that counsel's failure to test the State's case was "complete." To the contrary, the record as a whole reflects that defense counsel served as Rubio's legal advocate throughout trial. During voir dire, Rubio's attorney questioned and instructed the venire panel regarding the State's burden of proof and the presumption of innocence afforded to Rubio. Defense counsel's closing statement reminded the jury of its obligation to hold the State to its burden of proof. Rubio told the trial court his attorney had consulted him and he agreed with his attorney's decision to not cross-examine witnesses or present expert witness testimony.

The extreme circumstances required to presume prejudice are not before us in this case. Therefore, we conclude the *Cronic* presumption of prejudice does not apply and Rubio's ineffective assistance of counsel claim is governed by *Strickland*. We resolve Rubio's second issue against him.

<u>Rubio Is Not Entitled To Relief Under *Strickland*</u>

In his third issue, Rubio alternatively claims he received ineffective assistance of counsel under the two-pronged *Strickland* standard. Rubio specifically complains defense counsel failed to file substantive motions, make opening argument, cross-examine the State's witnesses, put on defense witnesses, file a formal discovery request, subpoena witnesses, ask the trial court for a continuance, hire an investigator, or conduct an investigation.[7] Rubio suggests that, had defense counsel taken these measures, he could have pursued a defense of insanity or offered mitigating evidence to the State to reach a plea bargain. In response, the State points to its sole cross-issue on appeal and argues the record is "wholly lacking" with respect to Rubio's third issue and,

---

[7] Rubio also contends defense counsel rendered ineffective assistance of counsel by conceding Rubio's guilt in closing argument. We already concluded that defense counsel did not concede Rubio's guilt in our resolution of Rubio's first issue.

–21–

therefore, this Court must "summarily overrule" this issue due to an insufficient record. The State also argues Rubio failed to show he was prejudiced by any action or inaction by defense counsel.

As discussed previously, evidence presented to the trial court in support of an untimely amended motion for new trial—and properly objected to by the State—may not be considered as part of the record on appeal. TEX. R. APP. P. 21.4(b); *see also Moore*, 225 S.W.3d at 570; *Licon v. State*, 99 S.W.3d 918, 926 (Tex. App.—El Paso 2003, no pet.). In his amended motion, Rubio attempted to raise additional claims that were not addressed in his timely motion for new trial, including an ineffective assistance of counsel claim. The State objected to these additional claims, as well as the late-filed supporting evidence, both after Rubio filed his amended motion for new trial and at the hearing. Because the State did so, the trial court should not have considered Rubio's amended motion. Instead, the trial court erroneously allowed Rubio to present evidence on his additional claims. *See* TEX. R. APP. P. 21.4(b); *see also Moore*, 225 S.W.3d at 570 (rule 21.4(b) permits State to insist the trial court rule only upon timely motion or timely amended motion for new trial). Therefore, we may not consider testimony or evidence presented to the trial court in Rubio's amended motion or during the September 21, 2018 hearing. *Cueva v. State*, 339 S.W.3d 839, 859 (Tex. App.—Corpus Christi-Edinburg 2011, pet. ref'd). Instead, we only may consider the trial record in determining whether trial counsel's performance was so deficient and so lacking in tactical or strategic decision-making as to overcome the presumption that defense counsel's conduct was reasonable. *See id.*; *see also Moore*, 225 S.W.3d at 570.

Unless Rubio can show in the trial court record that his attorney's conduct was not the product of a strategic decision, we must presume counsel's conduct was adequate unless it was so outrageous that no competent attorney would have engaged in it. *State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008). Moreover, Rubio must show his attorney's alleged deficiency caused prejudice, i.e., a reasonable probability that but for his attorney's deficient

conduct, the result of the proceeding would have been different. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009).

On the record before us, we conclude Rubio has not carried his burden of showing ineffective assistance of counsel under *Strickland*, and the presumption of reasonable assistance has not been overcome. *See Ex parte Martinez*, 195 S.W.3d at 730 n.14.

*Insanity Defense*

Rubio's ineffective assistance of counsel claim boils down to the allegation his attorney failed to adequately investigate and pursue a defense of insanity.[8] Texas law excuses a defendant from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. TEX. PENAL CODE ANN. § 8.01; *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). "The test for determining insanity is whether, at the time of the conduct charged, the defendant—as a result of a severe mental disease or defect—did not know that his conduct was 'wrong.'" *Ruffin*, 270 S.W.3d at 592. Under Texas law, "wrong" in this context means "illegal." *Id.* Thus, the question for purposes of an insanity defense is whether Rubio factually knew that society considered killing Elizabeth and James to be against the law, even though, due to his mental disease or defect, he thought the conduct was morally justified. *Id.* If Rubio knew his conduct was illegal by societal standards, then an insanity defense was not available to him. *Id.*

There is no evidence in the trial record indicating Rubio did not know his conduct was wrong or that he was incapable of conforming his actions to the requirements of the law at the time

---

[8] Rubio complains defense counsel ignored signs of insanity; ignored "bizarre behavior at trial"—for example, Rubio "smiled several times and gestured reassuringly toward his family," waved and blew kisses at his mother, and seemed "unfazed" when the sentence was announced; did not investigate the possibility of multiple-personality disorder; and did not investigate possible "stunted brain development" as evidenced by, among other things, Rubio's "emotional [im]maturity," ADHD, deprivation of basic needs as a child, untreated diabetes, and "desire to curry favor with father figures, fueled by rejection from his own father, [which] might have led him to acquiesce to police and trial counsel's case theories and 'strategies.'"

–23–

he killed Elizabeth and James. To the contrary, the evidence establishes that Rubio knew his conduct was wrong. After Rubio returned from his first confrontation at Connie's apartment, Dana tried to calm him in order to stop him from loading his shotgun and taking it with him on his return to Connie's apartment. Rubio responded that he was "tired" and could not "do it anymore." Immediately after he killed Elizabeth and James, Rubio fled Connie's apartment and ran to his own apartment, where he confessed the murders to Dana.

Moreover, Rubio has not proffered any facts from the trial record showing his attorney failed to thoroughly investigate an insanity defense. While this may be a difficult thing to do on direct appeal, we cannot assume that because a record is silent as to the depth of defense counsel's investigation of an insanity defense, he made no such investigation. In fact, the trial record reflects Rubio's attorney "investigated any possible defenses regarding mental health and hired a psychologist that interviewed the pertinent people." Rubio told the trial court he discussed this issue with his attorney and he agreed with "the way [his attorney] conduct[ed the] trial." Nor does the trial record contain evidence that, even if an expert witness was available and willing to testify that Rubio met the legal requirements of an insanity defense to murder, any such testimony would have resulted in a different outcome.

The trial record before us shows that defense counsel conducted an investigation and consulted with Rubio on the findings of the investigation. The trial record does not show the depth of the investigation. Counsel could have conducted an in-depth investigation and determined that the results of the investigation would not be helpful, or could be harmful, to Rubio's case. We conclude the trial record contains no evidence indicating defense counsel failed to sufficiently investigate a defense of insanity or that, if Rubio had asserted a defense of insanity, the outcome of the trial would have been different. Therefore, Rubio has failed to overcome the presumption that his attorney's investigation of a possible insanity defense was reasonable.

*Mitigating Evidence*

Texas law provides only two possible punishments in the event of conviction for capital murder: life imprisonment or death.

> (a) An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:
>
> (1) life, if the individual committed the offense when younger than 18 years of age; or
>
> (2) life without parole, if the individual committed the offense when 18 years of age or older.

TEX. PENAL CODE ANN. § 12.31(a). When the State seeks the death penalty, mitigating evidence may be presented at the punishment phase of trial, so the jury may determine whether any mitigating circumstances warrant a sentence of life imprisonment rather than a death sentence. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2. When the State waives the death penalty in a capital murder case, no mitigating evidence is required—there is no need to offer evidence of mitigating factors when no greater punishment than the minimum requisite punishment for the offense may be imposed.

In this case, the State did not seek the death penalty. If Rubio was adjudged guilty of the charged offense of capital murder, section 12.31 of the Texas Penal Code required the trial court to impose a sentence of life imprisonment without the possibility of parole. Mitigating evidence, therefore, would not be presented at trial. The only role mitigating evidence could play is in negotiating a plea agreement with the State for a reduced charge and life imprisonment with the possibility of parole.

Rubio's claim that defense counsel did not offer mitigating evidence to the State in an attempt to negotiate a plea bargain is not supported by the trial record. Nothing in the record on appeal shows that defense counsel did not offer mitigating evidence to the State for plea purposes. A silent record will not suffice as an affirmative showing of ineffectiveness. *See Thompson*, 9

S.W.3d at 813–14. We conclude Rubio has failed to overcome the strong presumption of reasonable assistance with respect to defense counsel's presentation to the State of mitigating evidence in an attempt to reach a plea bargain.

*Opening Statement*

Rubio complains trial counsel did not make an opening statement. The option for defense counsel to deliver an opening statement after the State's opening statement is discretionary. TEX. CODE CRIM. PROC. ANN. art. 36.01(b). Waiving opening argument is an inherently tactical decision. *Taylor v. State*, 947 S.W.2d 698, 704 (Tex. App.—Fort Worth 1997, pet. ref'd); *see also Calderon v. State*, 950 S.W.2d 121, 128 (Tex. App.—El Paso 1997, no pet.) (opening statement may have been "deemed unnecessary, if not strategically undesirable," if trial strategy is to demonstrate State did not prove case beyond a reasonable doubt); *Standerford v. State*, 928 S.W.2d 688, 697 (Tex. App.—Fort Worth 1996, no pet.) (waiving opportunity to make opening statement is a tactical decision and "would have given the State a preview of the defense's strategy"). Here, the record is silent as to the reason underlying defense counsel's decision to not make an opening statement, and we may not speculate as to his rationale. *Bone*, 77 S.W.3d at 835. We cannot conclude, under the record before us, that defense counsel's election not to make an opening statement was not reasonable trial strategy, and Rubio has not overcome the presumption that his attorney's conduct was reasonable.

*Cross-Examination of Witnesses/Calling Witnesses*

Rubio complains his attorney did not cross-examine the State's witnesses or call witnesses to testify. Initially, we note that Rubio does not contend, and the trial record does not show, that Rubio was unaware of or disagreed with his attorney's decision not to cross-examine the State's witnesses. To the contrary, the trial record shows Rubio discussed this decision with defense counsel and he expressed to the trial court there was "nothing said or raised in the courtroom [he]

felt was necessary to cross-examine." During the course of trial and out of the presence of the jury, defense counsel admonished Rubio:

> Defense counsel: My client's already been sworn, Your Honor. Just for record purposes. [Rubio], we spoke at the pretrial hearing in regards to the nature of the allegations against you and the fact that we investigated any possible defenses regarding mental health and hired a psychologist that interviewed the pertinent people in this story. You know that her and I had interviewed Dana Grove, Niki, one of the witnesses that just testified, as well as your mother and talked to people about the fact of whether or not there were any pertinent mental or medical issues that needed to be investigated or raised that we could raise in regards to this case. You and I have had a chance to talk about all of that; is that right?
>
> Rubio: Yes, sir.
>
> Defense counsel: Without really going into strategy, you and I have had opportunities to go through the police reports, the statements, what we expected these witnesses to testify to, and in the courtroom today they have been testifying. You and I have had opportunities to talk and discuss during that testimony what they are saying, what we expected them to say, and what they did say; is that right?
>
> Rubio: Yes, sir.
>
> Defense counsel: In that regard, it's very unusual that I hadn't been cross-examining these witnesses with regards to their recollection of the events that transpired, but I've discussed those things with you, and you have been in agreement that basically there's nothing, other than extremely minor points that have nothing to do with the actual activities of what took place that day. You've been in agreement through this point that there has been nothing said or raised in the courtroom that you felt was necessary to cross-examine; is that correct?
>
> Rubio: I could not think of anything.
>
> Defense counsel: Right. You and I spoke about it because you knew that I had previously interviewed Dana as well as the other witnesses and talked to them about the mental states and your behavior and those things. Just so that the record's clear, this is—the way we're conducting this trial has been done after we discussed it with each witness and you have been in agreement; is that correct?
>
> Defense counsel: Yes, sir.

Cross-Examination. "Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex*

–27–

*parte McFarland*, 163 S.W.3d at 756 (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)). "Furthermore, cross-examination is an art, not a science, and [the decision not to cross-examine a witness] cannot be adequately judged in hindsight." *Ex parte McFarland*, 163 S.W.3d at 756. "If ineffective, cross-examination can serve to bolster the credibility of the witnesses and underscore the very points that are sought to be impeached. Thus, unless there is a good basis on which to cross-examine . . . it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony." *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd). In this case, Rubio was fully informed of and agreed with his attorney's decision not to cross-examine the State's witnesses. Defense counsel reasonably could have determined that cross-examination of the State's witnesses would have been more damaging than beneficial. In the absence of a more developed record elucidating defense counsel's strategy with regard to cross-examination, Rubio has not overcome the strong presumption that his attorney's decisions regarding cross-examination fall within the wide range of reasonable professional assistance. *Ex parte McFarland*, 163 S.W.3d at 755–57.

Calling Witnesses. A claim of ineffective assistance of counsel based on counsel's failure to call witnesses fails in the absence of a showing of prejudice, i.e., that witnesses were available to testify and that the defendant would have benefitted from their testimony. *Perez*, 310 S.W.3d at 894 ("failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony.") (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). Thus, Rubio must identify witnesses defense counsel should have called and demonstrate a reasonable probability that but for counsel's failure to call these witnesses to testify, "the result of the proceeding would have been different" because "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 694–95.

Here, the trial record is devoid of any indication of any witness who, if called, would have been helpful to Rubio's case. Nor does the trial record affirmatively show why Rubio's attorney did not call witnesses. In the absence of record evidence of an explanation, we conclude defense counsel's decision not to call witnesses could be considered sound trial strategy and Rubio has not overcome the presumption that his attorney's conduct was reasonable. *See Crocker v. State*, 248 S.W.3d 299, 306 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (recognizing defendant may "merely elect[] to hold the State to its burden of proof rather than present his own evidence").

Expert Witness Testimony. Rubio does not contend, and the trial record does not show, that Rubio was unaware of or disagreed with the defense's decision not to present expert witness testimony on Rubio's mental health or mental state at the time of the murders. To the contrary, the trial record shows defense counsel conducted an investigation regarding Rubio's mental health and medical issues. Defense counsel hired a psychologist and they interviewed pertinent people regarding any germane mental or medical issues that could be raised as a defense. Counsel discussed the results of the investigation—as well as police reports and witness statements—with Rubio. During trial, Rubio told the trial court his attorney consulted him and he agreed with the way his attorney conducted the trial, including not pursuing a defense regarding mental health.

Rubio's speculation that trial counsel could have elicited testimony from an expert that Rubio was legally insane at the time he committed the murders is insufficient to support a claim of ineffective assistance. *See Bone*, 77 S.W.3d at 835 ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must 'be firmly founded in the record.'"). The trial record does not show that (1) even if an expert had testified Rubio "heard voices in his head" or suffered from multiple personality disorder, the expert also would have testified Rubio did not know killing Elizabeth and James was wrong or illegal at the time he murdered them, or (2) there

is a reasonable probability the jury would have believed any such testimony and found Rubio not guilty by reason of insanity.

We cannot speculate beyond the record provided and must presume the actions taken by trial counsel were part of a strategic plan for representing his client. *Young v. State*, 991 S.W.2d 835, 837–38 (Tex. Crim. App. 1999). The trial record is silent as to whether any witnesses were available, competent, and willing to testify that Rubio did not know his actions were illegal at the time he committed the murders, and we do not see a reasonable probability that any such testimony would have changed the result of the trial. Given the present record, we conclude Rubio has not shown that counsel's performance fell below an objective standard of reasonableness or was conduct "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

*Pretrial Motions/Discovery*

Rubio complains defense counsel "relied solely on the State to turn over its discovery" and did not make a formal discovery request under article 39.14 of the Texas Code of Criminal Procedure; and defense counsel did not file pre-trial motions "other than a standardized 'omnibus' pre-trial motion."

Rubio's contention that defense counsel was ineffective because he failed to file pretrial motions fails. In general, trial counsel's failure to file pretrial motions does not result in ineffective assistance of counsel. *See Martinez v. State*, 449 S.W.3d 193, 208 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Rubio must show a pretrial motion had merit and a ruling on the motion would have changed the outcome of the case. *See Roberson v. State*, 852 S.W.2d 508, 511 (Tex. Crim. App. 1993); *see also Straight v. State*, 515 S.W.3d 553, 565 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Rubio has not identified any specific pretrial motion counsel should have filed other than a written request for discovery under article 39.14 of the Texas Code of Criminal

Procedure. Article 39.14, however, does not require an attorney to file a discovery request, but rather, states that "as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection" of certain documents. TEX. CODE CRIM. PROC. ANN. art. 39.14. Moreover, Rubio has not indicated and the trial record does not show what Rubio could or should have received—that he did not receive—had defense counsel filed such a motion; how any such evidence would have changed the outcome of the case; or whether and how Rubio was prejudiced by defense counsel's failure to make such a request. Accordingly, Rubio has failed to show how counsel's actions were deficient or articulate a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687; *see also Giles*, 2019 WL 6486257, at *5; *Hoffman v. State*, No. 09-17-00172-CR, 2018 WL 5930308, at *8 (Tex. App.—Beaumont Nov. 14, 2018, pet. ref'd) (mem. op., not designated for publication) (ineffective assistance of counsel claim failed because appellant made no showing trial counsel's failure to obtain discovery would have changed outcome of trial or that it prejudiced her in any way). Based upon the record before us, we are unable to conclude that defense counsel's actions with respect to the filing of pre-trial motions and discovery were unreasonable, and, thus, deficient.

*Objections to State Witness Testimony*

Rubio's complaint that his attorney was ineffective because he objected twice to the testimony of James' mother, Diana Ortiz, "and then never again" also fails. Rubio does not indicate what testimony defense counsel should have objected to. Nor does the trial record show that the trial court would have sustained any additional objections to State witness testimony. The trial record is silent as to the reasons defense counsel did not object more than twice to the State's witness testimony, and we must presume the actions taken by trial counsel were part of a strategic

plan for representing his client. *See Duren v. State*, 87 S.W.3d 719, 733–34 (Tex. App.—Texarkana 2002, no pet.); *see also Young*, 991 S.W.2d at 837–38.

*Request for a Continuance*

Rubio complains his attorney did not request a continuance. There is nothing in the record before us to indicate defense counsel needed more time to prepare for trial and should have requested a continuance. Therefore, the record does not support the proposition that defense counsel was deficient in failing to seize an opportunity to delay the trial.

In sum, viewing the totality of the representation, we conclude Rubio has failed to meet his burden of presenting us with a trial record that shows ineffective assistance of counsel. Rubio's timely motion for new trial did not include any ineffective assistance of counsel complaints. Consequently, the trial record contains no evidence as to possible strategies employed by defense counsel regarding Rubio's complaints on appeal. Because the record is silent as to defense counsel's motivations for tactical decisions at trial, to find that his strategy rendered his performance deficient would require us to speculate, which we cannot do. *See Jackson*, 877 S.W.2d at 771. Each deficiency alleged by Rubio could have been an exercise of reasonable professional judgment. Accordingly, Rubio has not overcome the strong presumption that defense counsel rendered adequate assistance of counsel in this instance. We resolve Rubio's third issue against him.

### Issues 4 and 5: There Was No Jury Charge Error

In his fourth and fifth issues on appeal, Rubio claims he suffered egregious harm when the trial court did not, sua sponte, charge the jury on the lesser-included offenses of murder and manslaughter.

When a defendant raises a claim of jury charge error, the reviewing court first determines whether there was error in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).

If the charge was erroneous, the reviewing court then conducts a harm analysis. *Id.* The question of whether error was preserved for review need not be addressed if there was no error in the charge.[9] *See id.*

A trial court does not err by refraining to submit lesser offense instructions without a request by the defendant. *Tolbert v. State*, 306 S.W.3d 776, 780–81 (Tex. Crim. App. 2010); *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (concluding the trial court does not have a duty to sua sponte instruct the jury on lesser-included offenses, which frequently depend upon trial strategy and tactics); *see also Giles*, 2019 WL 6486257, at *3. Here, Rubio did not request an instruction on murder or manslaughter and the trial court did not err by not, sua sponte, including any such instruction. *Delgado*, 235 S.W.3d at 250 ("It is clear that the defense may not claim error successfully on appeal due to the omission of a lesser-included offense if the defense refrained from requesting one.")*. We resolve Rubio's fourth and fifth issues against him.

### Issue 6: Rubio Failed to Preserve His Constitutional Claims Regarding His Sentence

In his sixth issue on appeal, Rubio claims the imposition of a mandatory sentence of life without parole violates the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 10, 13, and 19 of the Texas Constitution. When a defendant is found guilty in a capital felony and the State has not sought the death penalty, a sentence of life without parole is mandatory. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1; TEX. PENAL CODE ANN. § 12.31(a)(2). Here, the State indicted Rubio for capital murder, and it did not seek the death penalty. The jury returned a guilty verdict, and the mandatory statutory punishment was life imprisonment without the possibility of parole.

---

[9] Under *Almanza v. State*, jury charge error requires reversal if the defendant properly objected to the charge and the reviewing court finds "some harm" to the defendant. 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When the defendant failed to object to the jury charge, the reviewing court must find the charge error caused "egregious harm" to the defendant. *Id.*

Preservation of error is a systemic requirement on appeal. *Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). "[A]ll errors—even constitutional errors—may be forfeited on appeal if an appellant failed to object at trial." *Garza v. State*, 435 S.W.3d 258, 260–61 (Tex. Crim. App. 2008). To preserve a complaint that a sentence constitutes cruel and unusual punishment or violates due process and due course of law under the United States or Texas constitutions, a defendant must make a timely, specific objection in the trial court. *Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013); *Lucero v. State*, 246 S.W.3d 86, 98 (Tex. Crim. App. 2008); *Heidelberg v. State*, 144 S.W.3d 535, 537, 542–43 (Tex. Crim. App. 2004); *Rhoades v. State*, 934 S.W.2d 113, 120–21 (Tex. Crim. App. 1996); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *see also Harris v. State*, 475 S.W.3d 395, 400 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

Because Rubio failed to raise his constitutional complaints regarding his statutorily mandated sentence in the trial court, he is not entitled to appellate review of those complaints.[10] We resolve Rubio's sixth issue against him.

---

[10] Even if Rubio had preserved his constitutional complaints—which he did not—the United States Supreme Court and Texas courts of appeals have consistently held that statutes imposing an automatic life sentence without the possibility of parole for adult offenders are constitutional. *See Harmelin v. Michigan*, 501 U.S. 957, 994–95 (1991) (unequivocally holding that imposition of mandatory sentence of life in prison without possibility of parole does not violate Eighth Amendment's protection against cruel and unusual punishment); *Lopez v. State*, 493 S.W.3d 126, 139–40 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd), *cert. denied*, 137 S. Ct. 1076 (2017) (holding mandatory life sentence, without possibility of parole, did not violate Eighth Amendment or article 1, section 13 of Texas Constitution, nor did it violate constitutional due process rights); *Modarresi v. State*, 488 S.W.3d 455, 467 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding penal code section 12.31(a)(2) did not impose cruel and unusual punishment prohibited by United States and Texas constitutions); *see also Duran v. State*, 363 S.W.3d 719, 721–23 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (concluding Eighth Amendment is not violated by unavailability of any procedural mechanism to allow court or jury to consider mitigating factors under mandatory sentencing scheme contained within penal code's habitual offender statute).

We affirm the trial court's judgment.

/Ken Molberg/
_____
KEN MOLBERG
JUSTICE

Publish
TEX. R. APP. P. 47.2
180861F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER MICHAEL RUBIO,
Appellant

No. 05-18-00861-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1633703-W.
Opinion delivered by Justice Molberg.
Justices Bridges and Partida-Kipness
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of February, 2020.